**AVCO CORPORATION and Insurance Company of North America, Petitioners in Error,**

**v.**

**Valeta M. SWARTZLANDER, in the matter of the death of James W. Swartzlander, and State Industrial Court, Respondents in Error.**

No. 43258.

Supreme Court of Oklahoma.

May 19, 1970.

Rogers, Donovan & Rogers, Tulsa, for petitioners.

Thomas A. Wallace, Craig R. Tweedy, Sapulpa, G. T. Blankenship, Atty. Gen., for respondents.

LAVENDER, Justice.

There is involved here for review an award entered by the State Industrial Court in a death action. Parties will be referred to as they appeared before the State Industrial Court. Deceased, James W. Swartzlander, will be referred to as "deceased."

The trial judge entered an award for death benefits to claimant Valeta M. Swartzlander, surviving widow of the "deceased."

The State Industrial Court affirmed the award.

Respondent contends that the award of the State Industrial Court is not sustained by the evidence, is contrary to the evidence and is contrary to law.

It is admitted that the deceased on December 31, 1964, was employed and working for the respondent as a fitter and welder, a hazardous employment within the provisions of the Oklahoma Work-

men's Compensation Act. 85 O.S.1961, §§ 2 and 3.

James T. Scism, a co-worker, testified that he and deceased, on December 31, 1964, were working for the respondent as a team building steel tanks. They commenced working that day at about 8 o'clock A.M. They first lifted a tank, about eighteen inches in diameter and weighing approximately one hundred eighty-five pounds, from a table onto the floor, a distance of about three feet. They also lifted a tank shell from the floor to the table and then with the use of a small bar and chain pried on it to get it in shape. The tank shell weighed about one hundred twenty pounds. They carried the tank shell about fifteen feet. There were no handles on the tank or the tank shell. Each man placed his hands under the shell and lifted it. This lifting process was regular procedure and they would lift about ten or twelve tanks each day including the date before December 31, 1964.

On that date after witness and decedent lifted the tank shell up on the table, the deceased began cleaning the tank head preparatory to welding it onto the tank shell. He used rags and Mo-Vat cleaning solution in cleaning the head. It was neessary for the deceased to move the head and turn it over in cleaning it.

Deceased walked across the building to a telephone to call Jasper Cox, the plant manager. He returned from the telephone, sat down on a bench, and placed his hands on his knees. Scism went over to him and asked him what was the matter. Deceased replied, "I have a hurting in my shoulder" and said, "Boy, my shoulder's really hurting." Deceased left the building and went to his pickup truck to secure some Bufferin tablets. Thinking he had been gone too long, Scism went out to the truck. He found deceased seated in his truck. His face was white and there were balls of sweat on his forehead. He said to Scism, "James, I am burning up" and then, "I am freezing to death."

An ambulance transported the deceased to a hospital where he was examined by Dr. P. Dr. P called Dr. E in consultation. Dr. E diagnosed deceased's condition upon admission to the hospital as being arteriosclerotic cardiovascular disease with coronary sclerosis, coronary occlusion and acute myocardial infarction.

Dr. E testified deceased was in shock for the first four or five days and was "critically and severely ill" and was "in a complete heart block."

Deceased remained in the hospital until February 18, 1965. Dr. E testified that upon dismissal from the hospital deceased "looked good, his heart was about good, considering the problems" and while "he did not anticipate an immediate problem the chances were sure that there could be a problem." He said that deceased was on medication when he left the hospital such as "anticoagulents, therapy, dilators and everything else."

Dr. E testified:

"There is no question but that the lifting probably increased his statistic percentile—increased the statistical percentile factor of having a coronary occlusion. It was a basic initiating factor of the situation, but whether that is a true cause to relationship, I just cannot make a definite statement. Now, on that particular morning, if he had rested and not worked, he might not have had a coronary occlusion.

\*   \*   \*   \*   \*   \*

" \* \* \* If you mean that the probability of his having an infarction is enhanced by exerting himself, I will have to answer yes.

\*   \*   \*   \*   \*   \*

"In general, in any individual, the problem is increased with exertion. However, if you mean that the probability of his having a coronary occlusion on this particular morning increased because of exertion, I would have to say yes, on the one hand, yes. If he was ready to have an infarction. On the other hand, I would have to say no, if

it was his usual occupational activities and that it wasn't an actual cause to effect relationship. I don't see how else I can answer that question.

"* * * coronary occlusion is increased with exertion."

He was asked, "Isn't the probability of a coronary occlusion increased by exertion" and replied, "Yes, I will answer that unqualifiedly" and continued:

"I would say the days he does this, the probability is increased over the days that he doesn't do it. * * *"

Dr. E examined deceased several times after he left the hospital, the last time being March 17, 1965. He was pleased with deceased's condition and considered the possibility of deceased returning to work about the middle of April.

Deceased died in the Bartlett Memorial Hospital, Sapulpa, Oklahoma, on March 23, 1965. The death certificate lists the cause of his death as being "coronary occlusion", the interval between onset and death being thirty minutes, due to arteriosclerotic cardiovascular disease, the interval between onset and death being three months, and arteriosclerosis (general), the interval between onset and death being one year. There are also listed other significant conditions contributing to death but not related to terminal disease, "myocardial infarction" occurring December 31, 1964.

Dr. B, answering a hypothetical question which included the pertinent facts with reference to the work deceased was doing at the time of his attack, testified:

"That the exertion of the carrying out of his occupational responsibilities on that morning certainly was a contributing factor to the development of his illness."

On cross-examination Dr. B testified that many factors can cause a heart failure but he thinks "it is disputable that the performance of his (deceased's) work on the date of the development of the illness could not be other than identified as a factor in the development of his illness."

Respondent, on December 31, 1964, carried two insurance policies covering sickness and disability claims of its employees. They were a workmen's compensation policy with the Insurance Company of North America covering workmen's compensation claims of respondent's employees, and a second policy with the Metropolitan Life Insurance Company covering claims not arising under the Workmen's Compensation Act. Respondent paid the premiums on both policies. the I. N. A., respondent's Workmen's

Charles D. Slaton, resident representative of the Tulsa claim department of Compensation insurance carrier, interviewed the deceased while he was in the hospital on February 9, 1965. Slaton testified that deceased was sitting up in bed and appeared to be feeling good. Slaton took a longhand narrative statement from the deceased. In the statement deceased related that he did not pick up any of the tank heads but pushed them aside, did no lifting and nothing more strenuous than cleaning the tank heads. He described his attack, his testimony being identical with the testimony of the co-worker Scism.

Deceased received weekly health benefits for $52.00 from Metropolitan until his death and his widow received a death benefit of $6,000.00 upon his death.

■ The statement made by the deceased to the witness Slaton regarding the work he was doing on the day of his attack, also the acceptance of benefits by the deceased from the Metropolitan on the theory that he did not sustain a compensable injury, are factors to be considered by the trial court in weighing the evidence. They are not a bar to the prosecution of the present action for death benefits by the widow. National Gypsum Company v. Brewster (1969), Okl., 461 P.2d 593.

The circumstances surrounding the attack deceased sustained on December 31, 1964, support the contention of the claim-

ant that the attack was motivated and caused as the result of stress and strain sustained during the course of his work. Deceased reported for work at 8:00 A.M. There is sufficient evidence, although disputed and contradicted, to establish that the deceased sustained a lifting strain within thirty minutes after he commenced work. He collapsed as the result of a serious coronary occlusion within a few minutes. His condition was critical and he was in intensive care for about a week. He never recovered to the extent of being able to return to work and died on March 23, 1965, one of the causes of his death being the coronary occlusion, according to competent evidence.

We have held that the widow in establishing her claim for death benefits arising out of the death of her husband while industrially employed is not limited to direct evidence but is entitled to the benefits of proven circumstantial evidence in establishing that the death of the deceased arose out of his employment from causes related to his employment. The circumstantial evidence need not be established to that degree of certainty as to preclude reasonable men from drawing opposite inferences. Flint Construction Co. v. Downum (1968), Okl., 444 P.2d 200.

Respondent argues that the heart attack of the deceased was the result of a natural disability to his heart existing prior to the date of the accident and was not precipitated by stress or strain occurring on December 31, 1964. We have held that an accidental injury arising out of and in the course of the employment which aggravates a prior heart condition of an employee, creating a disability which did not previously exist, is compensable. Board of County Commissioners of Tulsa County v. Parker (1969), Okl., 451 P.2d 936, and cases therein cited. Compensation may be allowed although claimant's heart was not in perfect condition on the date of the injury, id.

We have held in several cases that a heart disability caused or precipitated by a strain or exertion while the employee is doing his work in the usual and customary manner is compensable although the precipitating exertion was not unusual. Board of County Commissioners of Tulsa County v. Parker, supra; Flint Construction Co. v. Downum, supra; and Bill Gover Ford Company v. Roniger (1967), Okl., 426 P.2d 701.

The accidental strain or exertion need not be the sole cause of the heart disability but is sufficient if it is a direct and contributing cause of such disability.

Whether a heart attack suffered by a workman resulting from strain and exertion arising out of and in the course of his employment or from other causes which are unrelated thereto and disconnected therefrom, presents a question of fact for the determination of the State Industrial Court, whose finding on such issue will not be disturbed by this Court on review when based on competent evidence reasonably tending to support it.

The award of the State Industrial Court is sustained by sufficient reasonable, competent evidence, both lay and medical, and is in accord with the law as declared by this Court in prior decisions.

Award sustained.

All of the Justices concur.